TAYLOR v. PRICHARD et al.

No. 34008.    March 27, 1951.

Rehearing Denied May 1, 1951.

*230 P. 2d 728.*

Omer Luellen, Hinton, and Looney, Watts, Ross, Looney & Smith, Oklahoma City, for plaintiff in error.

John D. Cheek, Jas. C. Cheek, (of Cheek, Cheek & Cheek), Oklahoma City, for defendants in error.

HALLEY, J. We shall refer to the parties as they appeared in the trial court.

Plaintiff alleged that her deceased husband was an employee of the defendants at their filling station in El Reno, Oklahoma, and was required to repair a tire near Highway 66 just east of El Reno, in the nighttime, and while so engaged was struck by a passing motorist and so injured that he died soon after the accident.

It is alleged that the defendants negligently failed to furnish the decedent with proper flares or other lights necessary to warn passing motorists of his presence, and that such failure on the part of the defendants caused or contributed to his death. At the conclusion of the evidence, the trial court directed a verdict for the defendants, and plaintiff has appealed.

The pertinent facts are that the defendants operate in the vicinity of El Reno a gasoline filling station, where they market petroleum products and render the usual filling-station service, including the repair of tires. H. N. Hensley was superintendent of the station and appears to have spent each day at the station, but was seldom there at night, when two attendants were on duty. As manager, he had full authority to employ and direct filling-station

attendants. On January 13, 1946, the decedent Taylor and Raymond Frittz were on duty at the station, with Taylor in charge. At about 1:30, or 2:00 a.m., on that date, a motorist named Plato came into the station and reported that he had a flat tire on the highway just east of El Reno, and requested help. Mr. Taylor agreed to go in his own car, which Mrs. Taylor had driven to the station a short while before. Taylor and Plato arrived at the place where the Plato car was parked to the right of the pavement and on the shoulder of the highway, facing north. Taylor parked his own car so that the headlights would light up the right side of the Plato car, where the flat tire was located. At the location of the Plato car, Highway 66 approaches from the south and turns sharply to the west. At this turn in the pavement there is a dirt or gravel road extending to the north in practically the same direction as the pavement approaching the turn from the south. There is also a dirt road extending toward the east from the point where the pavement turns west. The Plato car had been stopped several feet east of the pavement. The Taylor car was stopped facing south, or slightly southeast, and near the front end of the Plato car, so that the headlights of the Taylor car lighted the right or east side of the Plato car. While these cars were so located, both entirely off the pavement and on the shoulder of the highway, a motorist named Grimes approached on the highway from the south. He saw the headlights of the Taylor car 75 or 100 feet before he reached it, but denied that he saw the Plato car or the two men who were working on its right side. He appears to have brushed the Plato car and momentarily lost control of his car. He struck and fatally injured both men, and ran head-on into the front end of the Taylor car. He testified that he thought the Taylor car was about to come upon the pavement and drive south.

The plaintiff presents only two propositions: First, she claimed that the court erred in directing the verdict for the defendants because the evidence shows that the defendants were negligent in failing to furnish their employee Taylor, her deceased husband, with safe and proper equipment with which to work. Second, she claimed that the evidence of proximate cause was sufficient to justify submission to the jury. The defendants did not claim that they furnished plaintiff's decedent with flares, fuses or spotlights for use at night when rendering road service. The defendants contended that they did not hold themselves out to do road service, and that if it was done by their employees it was not done for the defendants, but by the employees for the accommodation of the customer, and that any compensation for the trip was taken by the employee, and the defendants only received payment for work done at the station. There was evidence supporting this contention. We have been unable to find any evidence that shows that the defendants held themselves out as doing road service, and none that the employees were instructed to go out at night to repair tires. In fact, the evidence shows that Hensley, the manager of defendants' station, told a fellow-employee of the deceased shortly before the accident that the company was not furnishing equipment for road service because it was not in that business, as it did not pay. There is no evidence that the deceased was ever instructed to furnish road service on behalf of the defendants. H. N. Hensley testified that the defendants were not engaged in rendering road service, but that he had no objection to the attendants' helping motorists in distress, if they had time to spare from their station work, and that he had on occasion sent employees out on such missions in the daytime, but never at night. Raymond Frittz, the other attendant on duty on the night of the accident, testified in response to

the question of whether or not they rendered "road service", in part, as follows:

"No, sir, we don't make service calls. We didn't make any except on our own. . . . . We were not in that kind of business at that time. We just made them on our own."

When questioned about instructions as to making such calls, he said:

"We didn't have any on that. It was up to ourselves. We didn't have any truck service; it was left up to us. . . . We didn't charge anything for the road, except for repairing the tire at the station was put on the company's cash register."

It appears that some weeks before the accident this witness had approached Mr. Hensley in regard to securing equipment for rendering road service at night. His testimony regarding that conversation follows:

"Q. Mr. Frittz, as a matter of fact, you had asked Mr. Hensley to furnish you and Mr. Taylor with proper warning equipment to make these service calls before this unfortunate accident occurred, hadn't you? A. Yes, sir.

"Q. When and where was that? A. A few weeks before it happened at the time when Mr. Hensley was in the station.

"Q. What did you say and what did Mr. Hensley say? A. Well, I don't know the exact words, but we just asked about it, about flares and equipment, and Mr. Hensley said we was not in that kind of business; that we did not make service calls, and there was not enough in it, and it was not profitable to make service calls and put in the equipment. . . .

"Q. Were you ever told to go out on the highway to perform road service? A. No; we were never told we had to.

"Q. Now, did your employer or boss ever tell you to do that? A. No; he stated it was all right for us, if a friend or customer came in, to help him out if we could—but that we was never to leave the station unless convenient and the station sufficiently attended; that Mr. Hensley said . . . he didn't want to go into that business at all . . . very few stations are in that business or equipped for it; that he, Hensley, did not want to have anything to do with it, didn't want to get into that business. . . . Hensley said, 'If you boys want to go out and it doesn't interfere with your other business, you can go, if you don't go too much."

Other witnesses had been employed as attendants at the defendants' filling station, and testified that the superintendent had directed them on some occasions to make service calls in the daytime, but that they had never been required to make such calls at night. It is clear from the evidence that the filling station operated by defendants was not in the regular business of making such service calls. We have carefully considered all of the testimony, and conclude that it clearly supports the finding of the trial court that the evidence does not establish any duty on the part of the defendants to furnish road service equipment to their station attendants. In this case the deceased was not hired to do road service, and when he did so he was outside the scope of his employment and on his own, not performing services for his master. The general rule seems to be that in order to render a master liable for personal injuries to his servant, the injuries must have been received in the line of servant's duty. The scope of a servant's duties is to be defined by what he was employed to perform and what, with the knowledge and approval of his master, he actually did perform. 56 C.J.S., Master and Servant, §181.

Inasmuch as we hold that the plaintiff's deceased was not within the scope of his employment at the time he was killed, and was not performing duties for his master, and there was no liability upon the defendants in this case, it will not be necessary for us to discuss plaintiff's second proposition as to whether or not the evidence was suffi-

cient to justify submission to a jury on the question of proximate cause.

We think the action of the trial court in directing a verdict for the defendants was correct, and the judgment is affirmed.

Rehearing Denied May 1, 1951.